Filed 6/9/23 In re L.L. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.L. et al., Persons Coming Under the Juvenile Court Law. | |
| L.M. et al., <br><br> Petitioners, <br><br> v. <br><br> THE SUPERIOR COURT OF RIVERSIDE COUNTY, <br><br> Respondent; <br><br> RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, <br><br> Real Party in Interest. | E080657 <br><br> (Super. Ct. No. RIJ1900326 ) <br><br> OPINION |

ORIGINAL PROCEEDINGS; petition for extraordinary writ. Mona Nemat, Judge. Petition denied.

David Goldstein for Petitioner L.M.

Bryan Fazio for Petitioner M.L.

No appearance for Respondent.

1

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Larisa R-McKenna, Deputy County Counsels, for Real Party in Interest.

Pauline Obata-Hirose and Laurie Burns, for minors.

## I.

## INTRODUCTION

Following a contested jurisdictional/dispositional hearing, the juvenile court adjudged five-year-old Dev.L. (Dev.), four-year-old Dem.L. (Dem.) and two-year-old L.L. dependent children under Welfare and Institutions Code[1] section 300, subdivisions (a) (severe physical harm), (b)(1) (failure to protect), (e) (severe physical abuse), and (j) (abuse of sibling) because of severe physical abuse the children sustained in the care of their parents, petitioners L.M. (Mother) and M.L. (Father).[2] The juvenile court denied the parents reunification services under section 361.5, subdivision (b)(3), (5), (6) and (7) and set a section 366.26 hearing.

The parents seeks an extraordinary writ under California Rules of Court, rule 8.452 from the juvenile court's order setting the section 366.26 hearing and a stay of the section 366.26 hearing. Mother contends there was insufficient evidence to support the allegations under subdivisions (a) and (e) and that bypassing reunification services was not in the children's best interest. Father argues there was insufficient evidence to

---

[1] All future statutory references are to the Welfare and Institutions Code.

[2] Mother's older children (Da.C. and Do.C.) with a different father (D.C.) are not subjects of this appeal.

2

support a denial of reunification services under either section 361.5, subdivision (b)(3), (5) or (6) and that the court showed bias by believing one expert testimony over another expert's testimony. We deny the petitions and the parents' request for a stay.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Initial Petition*

The family came to the attention of the Riverside County Department of Public Social Services (DPSS) on June 11, 2019, after an immediate response referral was received with allegations of physical abuse to then one-month old Dem. Mother and Father had brought Dem. to a hospital because the infant was vomiting, lethargic, and had a seizure. The referral noted "the ophthalmology department found hemorrhages in his eyes, which was reported as an indicator for Shaken Baby Syndrome. . . . Both parents denied any falls or head trauma for Dem[.]"

The social worker attempted to contact the parents but was unsuccessful. The social worker eventually contacted Mother on June 14, 2019 with the assistance of law enforcement at the hospital. Mother did not know where the fathers or the other children were. She denied any head trauma to Dem. or any accident in which he may have fallen, but noted that he had a traumatic birth with the umbilical cord wrapped around his neck twice. Mother explained that she had taken Dem. to the hospital on May 17, 2019 because he had thrown up his feeding at around 3 p.m. and it was green. The hospital, however, cleared him to return home. On June 9, 2019, Mother stated her fiancée was

3

feeding Dem. and his eyes rolled back, so they brought him to the hospital. Dem.'s treating doctor indicated that Dem.'s bleeding in the eyes and the fluid in his brain were "'high indicators of shaken baby.'" The doctor also stated Dem. still had fluid on his brain that was being drained and that there were no skull fractures or other fractures. Dem. was diagnosed with subdural hematoma and retinal hemorrhages with concerns for Shaken Baby Syndrome.

After Mother continued to deny having any information regarding the location of Father or the older children, law enforcement arrested her for impeding an investigation. Law enforcement eventually located Father. Father stated Da.C. was at a football practice and the other two children were with the paternal grandmother at an unknown location. Law enforcement detained Father for child endangerment. DPSS placed Dem. and Da.C. in protective custody, and obtained protective custody warrants as to Dev. and Do.C., however the paternal grandmother and the parents evaded efforts to execute the warrants.

The parents had 12 prior child welfare referrals, commencing in March 2013, for allegations relating to physical abuse and general neglect. The referrals were closed as unfounded and/or inclusive or evaluated out.

On June 14, 2019, DPSS filed a petition on behalf of the children pursuant to section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), (e) (serious physical abuse), (g) (no provision for support), and (j) (abuse of sibling).

4

At the June 17, 2019 detention hearing, the juvenile court formally detained the children from parental custody, provided the parents with supervised visitation and pre-dispositional services, and continued the matter for further investigation. Following further investigation, DPSS amended the petition.

On June 21, 2019, a forensic medical examination was performed on then two-month-old Dem. by Dr. Sophia Grant. Dr. Grant found a linear abrasion on Dem.'s right upper leg and an erythematous bruise on the right side of his face which was uncommon for his age, and determined Dem. sustained injuries that were concerning for non-accidental trauma. Dr. Grant also observed Dem. had a lesion on the right tibia which was consistent with an abusive injury. Dem.'s treating physician at the hospital determined that there were concerns of Shaken Baby Syndrome, noting Dem. sustained retinal hemorrhages in both eyes which was highly suspicious for traumatic injury. The doctor further noted that Dem. had signs of old bleeding but no scalp contusions, "which meant the injury could be due to acceleration/deceleration injury and that shaking was a common mechanism of acceleration/deceleration."

A July 24, 2019 forensic medical examination of Dem. confirmed he was a victim of trauma including high velocity head injury with acceleration/deceleration and rotational forces to his head. The abusive head trauma was not a singular event and had occurred more than once "given the chronic nature of the subdurals." The medical examiner opined Dem. may suffer long term developmental consequence as a result of

the trauma. Dem. continued to suffer seizure activity and was classified as a medically fragile child, with possible developmental disability.

The parents' supervised visitation with the older children went well. They appropriately played with their boys and comforted them when they were upset. However, there were concerns with Father being too rough with the boys. In July 2019, DPSS provided the parents with referrals for services, and they indicated they would enroll in individual therapy. As of August 2019, the parents were attending parenting classes, but had not provided confirmation of being enrolled in counseling services.

The jurisdictional/dispositional hearing was held on October 16, 2019, over the course of nine days. The juvenile court struck the subdivisions (a) and (e) allegations of section 300, and found true the allegations under subdivisions (b) and (j). The court declared the children dependents of the court, provided reunification services to Mother and Father, and family maintenance services to father D.C.

On June 9, 2020, the court placed the children back in the parents' care, and terminated the dependency on December 9, 2020.[3]

B. *Reactivated Petition*

A day after the dependency was terminated, on December 10, 2020, DPSS received a referral that Dem. was admitted to the emergency room as a CT scan showed a new acute subdural hemorrhage. The following day, the social worker confirmed that Dem. was admitted due to acute subdural hemorrhage consistent with Shaken Baby

---

[3] Mother's older children were returned to the custody of their father D.C.

6

Syndrome. The doctor noted the injury occurred within the last month, and the bleeding was caused by "'trauma acceleration and trauma deceleration.'" The doctor emphasized that it was "'a clear indication of physical abuse to the head.'"

Mother refused to speak with law enforcement and the social worker. However, child abuse specialist Dr. Laura Jacobson stated Mother had informed medical staff that the child had no trauma history, that he was rambunctious and that he hurts himself. Dr. Jacobson noted that absent trauma history, the injuries were consistent with physical abuse to the head. Dr. Jacobson also stated that Mother was attempting to leave the hospital against medical advice. Dev. and Dem. were taken into protective custody.

On December 15, 2020, DPSS filed a reactivated petition alleging serious physical harm, severe physical abuse and neglect of Dem. and neglect of Dev. (§ 300, subds. (a), (b), (e), & (j)).

On December 16, 2020, DPSS filed an amended petition to include then three-month-old sibling L.L., whom the parents had kept undisclosed to DPSS. On this same day, the juvenile court formally removed the children from the physical custody of the parents.

DPSS recommended the court find true the allegations in the amended petition, that both parents be denied services pursuant to section 361.5 subdivision (b)(5) and (b)(6), and that a section 366.26 hearing be set. Dev. exhibited aggressive behaviors in his foster placement. He also disclosed to the foster parent that his parents would hit him in the face and demonstrated it by slapping himself. The children's forensic medical

7

examinations revealed that Dev. and L.L. were determined to have experienced neglect. L.L. had insufficient nutrition and growth, and Dev. had a previous tibia fracture consistent with abusive injury. A subsequent examination of Dev. showed he had sustained facial bruising and a fractured tibia that were suspicious for physical abuse. Dem.'s forensic examination revealed his injuries were highly suspicious for physical abuse.

DPSS noted that the parents had previously been offered parenting classes, individual counseling and medically fragile training, yet this was the second time Dem. had suffered a "'brain bleed'" while in his parents' care and the parents had failed to provide a credible explanation for Dem.'s injuries. DPSS was concerned the parents may be physically abusing the children based on prior history, the explanation of how the injury likely occurred from medical professionals, as well as Mother refusing to speak with law enforcement and DPSS.

In February, March and April 2021, DPSS filed second, third and fourth amended petitions, respectively, correcting errors in the prior petition and adding allegations based on Dev.'s tibia fracture and Mother's child welfare history.

Dem. underwent a new MRI in late May 2021. The results of his new MRI showed "'[s]table extensive bi-lateral cervical micro hemorrhage concerning for acute axonal injury.'" Dem. was assessed for and it was determined he had no bleeding disease. Dem.'s addendum forensic medical examination showed that Dr. Grant had specified the medical records she relied on to make her findings, further analyzed the

8

basis for the determination that Dem. was a victim of abusive head trauma, and confirmed her finding of physical abuse. Dr. Grant also explained Mother's claim that Dem. had Factor V Leidin mutation causing easy bruising was incorrect, as that condition contributes to thrombotic events rather than bleeding or bruising. Dr. Grant also expressed concern "'about the back and forth between bio parents and resource parents.'" The doctor explained: "'This type of instability is detrimental to the mental health of this child. Also concerning is the antisocial/aggressive behavior. I recommend trauma counseling and educational/developmental evaluation.'"

The contested jurisdictional/dispositional hearing ultimately began on January 9, 2023. DPSS's counsel submitted on the reports, evidence and extensive medical records filed with court, requested the court take judicial notice of the case records dating back to June 14, 2019, and asked the court to make findings pursuant to section 355.1 as requested in its trial brief filed July 19, 2022. DPSS's counsel also requested the court find true the allegations in the fourth amended petition dated April 15, 2021, that the parents be denied services pursuant to section 361.5, subdivisions (b)(3), (b)(5), and (b)(6), and a section 366.26 hearing be set.

On January 9, 2023, the parents presented testimony from expert witness Dr. Joseph Scheller, who appeared via zoom and had a private practice in neurology since 2014. Dr. Scheller had examined and reviewed the medical records and imaging in this case. The court qualified Dr. Scheller as an expert in pediatric neurology, but not in neuroimaging. Dr. Scheller testified that seizures "could be" caused by an infection and

9

confirmed that Dem. was found to have a viral infection on June 9, 2019. The MRI from June 10, 2019 showed evidence that Dem. had blood clots between the vessels in his brain which indicated he had suffered small strokes which "could" happen to anyone at any age, however tests to rule this out were not completed. Dr. Scheller also identified evidence of trauma based on chronic fluid buildup in the brain shown by the MRI conducted June 2019 and attributed it to childbirth as that was the only definite trauma incurred since birth. He noted that in an abusive trauma, significant blood clots would have shown up immediately on June 9, rather than gradually become more dramatic by June 14, 2019.[4]

Dr. Scheller further testified that the CT scan done on December 10, 2020 showed a very healthy brain without atrophy, except for the small hematoma which could be acute or chronic, and "could be" related to a prior condition. He explained that rebleeding from a previous subdural hematoma is a well-known complication, that there was no evidence Dem. had suffered a new head trauma, and that there was no evidence Dem. suffered child abuse on or about December 10, 2020. Dr. Scheller further stated that some people have venous strokes after head trauma with no long-term complications, but others have very serious complications including seizures.

---

[4] Counsels for DPSS and the children objected to evidence relating to June 19, 2019 based on res judicata as the injuries from June 2019 had already been substantiated as physical abuse. The court redirected counsel for the parents throughout the trial that the court will not relitigate injuries from 2019.

On January 10, 2023, expert witness Dr. Daniel Kido, who was qualified in neuroradiology, also testified on behalf of the parents. Dr. Kido testified that he had reviewed Dem.'s MRI images completed on May 24, 2021 and that the images reflected stable extensive bilateral cerebral micro hemorrhages concerning for acute axonal injury. The hemorrhages were residual of previous hemorrhages and were present extensively in both cerebral hemispheres. Dr. Kido observed mild cerebral atrophy, or generalized brain loss. He also saw a small subdural hematoma on the December 10, 2020 image and that the microhemorrhages looked the same on the images from December 10, 2020 and May 24, 2021. He explained that strokes or seizures would not cause microhemorrhages.

The parents also presented testimony from behavioral health specialist Tania Dominguez from Olive Crest foster placement and developmental specialist Sahar Dahabrah from Bright Horizons. Dominguez had worked with Dev. in his placement from March 2020 through October 2020. She noted that the parents were cooperative and graduated successfully from the program. Dahabrah had provided special needs services to Dem. for approximately six months in 2019. During that time, she had never observed Dem. to have seizure activity and noted the family was receptive and cooperative.

On January 11, 2023, child abuse pediatric specialist Dr. Grant, who was qualified as an expert, testified on behalf of the children. Based on her review of Dev.'s medical records, Dev. sustained a classic metaphyseal lesion on his lower leg, that is typically sustained from child abuse when an arm or leg is jerked suddenly. Dev.'s injury was

11

more than days old, which would mean it was incurred before he was placed in foster care. The doctor also stated that genetic bleeding and metabolic disorders had been evaluated and ruled out as a cause for Dem.'s injury. Dem. had been seen by a geneticist and hematologist, both of whom did not request further screening. Dr. Grant noted rebleeds are highly unusual and become less likely with the passage of time and that the amount of force needed to cause such a brain injury is more than any reasonable person would recognize as appropriate. Dr. Grant confirmed she rendered all of her medical opinions within a reasonable degree of medical certainty.

On January 12, 2023, Dr. Jacobson, a general and child abuse pediatric expert from Loma Linda Hospital, also testified on behalf of the children. Dr. Jacobson had performed a forensic physical examination on Dem. after pediatric neurologist Dr. Stanford Shu referred Dem. to Dr. Jacobson with concerns for inflicted trauma based on a completed CT scan. Dr. Jacobson also reviewed Dem.'s medical history and consulted with pediatric neuroradiology, pediatric neurology and neurosurgery. Dr. Jacobson confirmed she had diagnosed Dem.'s injuries as acute left frontoparietal subdural hematoma, noting the injuries incurred were seven to 10 days or more recent. Dr. Jacobson also confirmed she diagnosed Dem. with extensive bilateral cerebral microhemorrhage, which causes concern for actual injury to the axons or neurons of the brain. Dr. Jacobson noted this may not be a new injury, however the injury requires significant force similar to high-speed vehicle accidents, and is one of the leading causes of morbidity and mortality in cases of abuse. Dr. Jacobson confirmed the subdural

12

hematoma was highly suspicious for inflicted trauma, i.e., physical abuse. Dr. Jacobson explained the December 2020 injury is significant because the original injury was in 2019, and a scan in July 2020 was normal. The initial bleed thus had likely resolved. Rebleeds also do not usually happen so long after the initial injury, and do not occur outside the location of the initial injury. Dem. was assessed for bleeding disorders, vascular malformations, hematology, metabolic tests, and genetic tests, which all came back normal. Dr. Jacobson confirmed all her opinions were rendered on a reasonable degree of medical certainty. Dr. Jacobson acknowledged that stroke in a young infant can occur but that is uncommon.

On January 13, 2023, treating physician and pediatric neurologist at Loma Linda Medical Center Dr. Shu testified on behalf of the children as well. Dr. Shu had reviewed Dem.'s MRIs in December 2020. These MRIs showed areas of microhemorrhages in both hemispheres, as well as subdural fluid collections, which combined with abnormal choline to creatine ratio consistent with diffuse axonal injury. Dr. Shu opined Dem. suffered abusive head trauma based on a reasonable degree of certainty. The images showed large hemorrhages from trauma, and hemorrhages in the intraretinal and subretinal regions of the eyes. Dr. Shu clarified that "diffuse" means more than one area and "acute" means recent in time, though they can be used interchangeable by radiologists. Dr. Shu noted the parents had told him Dem. had a genetic disorder that causes increased clotting, however it was not reflected in his medical records and a blood specialist had determined Dem. had no such disorder. Dr. Shu noted that more than five

13

hemorrhages at five millimeters was a cause for concern and that the hemorrhages were distant from the site of the location of the drain procedure. Dr. Shu further testified that the microhemorrhage was also not likely caused by a stroke because the hemorrhages were larger in size and that increased cranial pressure was not a cause of bleeding, as no sinus thrombosis was identified by any of the radiologists after seven images were done at Kaiser Hospital.

On January 17, 2023, Dr. Scheller testified on cross-examination. Dr. Scheller stated he had testified over 300 times in abusive head trauma cases, and always testified for the defense and 75 percent of his income was derived from providing trial testimony. Dr. Scheller acknowledged that his testimony had been struck as unreliable in a federal district court abusive head trauma case because he had stated his "'testimony is not supported by the established scientific research on abusive head trauma.'" Dr. Scheller stated that was one of his four excluded testimonies out of 300. Dr. Scheller admitted his opinion that acceleration/deceleration does not cause abusive head trauma was a minority opinion of pediatricians that he had worked with, and that he was at odds with the American Academy of Pediatrics and the World Health Organization. Dr. Scheller explained that there was "a prominent pediatric child abuse doctor who sent a survey to more than 800 doctors to find if they liked the idea of shaken baby syndrome, and approved of the idea, and approve of the idea of abusive head trauma" and that from the 400 responses "the vast majority said that they do approve of the idea of shaken baby syndrome, and they do approve of the idea of abusive head trauma." Dr. Scheller

14

testified that he still did not believe abusive head trauma was a worthwhile or helpful diagnosis and admitted that he did not reference any scientific medical research in his report for the current case. Dr. Scheller also admitted he has not held a doctor's license since 1991 and did not personally examine any of the children.

On January 18, 2023, Father's counsel requested to submit documents, and counsel for DPSS objected citing relevance, lack of foundation and beyond discovery closure. The juvenile court denied Father's counsel's request. Thereafter, the parents' counsel cross-examined the social worker as to her investigation in this case. In response to counsels' questions, the social worker testified that she considers facts to form her opinions during investigations and does not consider race when conducting investigations. The social worker explained that she was provided training regarding African Americans' distrust in dealing with government agencies. The social worker did not recall whether Father had reservations speaking with her, but noted Father's refusal to speak with her about his social history was based on direction he was given to not to speak with her. She acknowledged the parents were appropriate at visits. The social worker noted the children had not sustained any further hematomas or broken bones while in foster care.

On February 3, 2023, the juvenile court found true the allegations in the fourth amended petition, declared the children dependents of the court, denied the parents reunification services pursuant to section 361.5, subdivisions (b)(3), (5), (6), and (7), and set a section 366.26 hearing. As to disposition, the court explained, "At this point, the

15

[c]ourt in light of all of the evidence, the [c]ourt found Dr. Jacobson's testimony to be the most persuasive, and Dr. Scheller's testimony to be the least persuasive." Mother and Father each filed a timely notice of intent to file a writ petition.

III.

DISCUSSION

A. *Jurisdictional Findings*

Mother contends there is insufficient evidence to support the allegations under section 300 subdivisions (a) (serious physical harm) and (e) (severe physical abuse) as to Dem. and Dev. The crux of her argument is that there was no evidence the children were injured as a result of an act of abuse by her. Consequently, there was no basis for the juvenile court to bypass reunification services under section 361.5. (See § III.B., *post*.) We conclude that the evidence was sufficient to support the court's true findings under section 300, subdivisions (a) and (e).

We initially note that "[w]hen a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence. [Citations.]" (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451; accord, *In re D.P.* (2014) 225 Cal.App.4th 898, 902.) In other words, "'the juvenile court's jurisdiction may rest

16

on a single ground.' [Citation.]" (*In re Christopher C.* (2010) 182 Cal.App.4th 73, 83.) Here, neither parent challenges the allegations sustained under section 300, subdivisions (b) (failure to protect) and (j) (abuse of sibling) as to the children. Thus, it is undisputed that the children came within the jurisdiction of the court. (See *In re Christopher C.*, *supra*, at p. 83.) As such, we will only address Mother's claim regarding the court's finding under section 300, subdivision (e), since it is related to her other claim that there was no basis for denying her services under section 361.5, subdivision (b)(5). (See *In re Christopher C.*, *supra*, at p. 83.)

"'"In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. 'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" [Citations.]" (*In re L.O.* (2021) 67 Cal.App.5th 227, 238, quoting *In re I.J.* (2013) 56 Cal.4th 766, 773; accord, *In re R.T.* (2017) 3 Cal.5th 622, 633.)

Section 300, subdivision (e) provides, in pertinent part, that the court has jurisdiction where "[t]he child is under five years of age and has suffered severe physical abuse by a parent . . . . For the purposes of this subdivision, 'severe physical abuse'

17

means any of the following: any single act of abuse that causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death . . . or more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or unconsciousness." The court in *In re Joshua H.* (1993) 13 Cal.App.4th 1718, 1727, interpreted this language to impose three requirements on the agency to establish jurisdiction under this subdivision: "(1) there is a minor under the age of five; [¶] (2) who has suffered severe physical abuse as defined in section 300, subdivision (e); [¶] (3) by a parent or any person known to the parent if the parent knew or reasonably should have known that the person was physically abusing the minor."

Substantial evidence supports the juvenile court's true finding that Dem. and Dev. suffered severe physical abuse consistent with the provision of subdivision (e), and that the parents knew or reasonably should have known of the physical abuse. As to Dem., the subdivision (e) allegation in the fourth amended petition stated: "While in the care and custody of the parents, the child, [Dem.] suffered from an Acute Subdural Hemorrhage, and the mother's explanation is inconsistent with the injury. Further, a medical examination determined the injuries to be consistent with trauma acceleration and trauma deceleration, and found to be clear indication of physical abuse to the head, and/or of a nature as would ordinarily not be sustained except as a result of the unreasonable or neglectful acts or omissions of the mother and/or father, pursuant to Welfare and Institutions Code section 355.1." As to Dev., the subdivision (e) allegation

18

stated: "While in the care and custody of the parents, the child, [Dev.] suffered a fracture to the metaphysis (metaphyseal lesion to the right tibia) which was deemed by a medical professional to be consistent with abusive injury. This injury is of a nature as would ordinarily not be sustained except as a result of the unreasonable or neglectful acts or omissions of the mother and/or father, pursuant to Welfare and Institutions Code 355.1."

On November 4, 2019, the juvenile court found that Dem. had suffered a head injury caused by physical abuse. Specifically, the court found that "[w]hile in the care and custody of the parents, the child [Dem.] suffered from brain fluid and hemorrhages of the eyes, and the mother's explanation was inconsistent with medical findings. Medical professionals deemed the injuries to be an indication of Shaken Baby Syndrome." After the court sustained the physical abuse allegation and provided reunification services to the parents in 2019, the court placed the children in the parents' care and terminated the dependency on December 9, 2020. However, the very next day, Dem. was admitted to the emergency room as a CT scan showed a new acute subdural hemorrhage. The forensic medical examination of Dem. determined his head injuries were highly suspicious for physical abuse. The forensic medical examination of Dev. showed a healing tibia fracture consistent with abusive injury, and a subsequent forensic examination for Dev. determined he had sustained facial bruising and fractured tibia suspicious for physical abuse. Furthermore, Dev. exhibited aggressive behaviors in his foster placement. He also disclosed to the foster parent that the parents hit him in the face and then demonstrated it by slapping himself.

19

Dem.'s May 2021 medical examination showed "'stable extensive bi-lateral cervical micro hemorrhage concerning for acute axonal injury.'" Dem. was assessed and determined he had no genetic conditions that could result in cerebral bleeding. All of the doctors that had examined Dem. opined that Dem. was a victim of abusive head trauma, a victim of Shaken Baby Syndrome, and confirmed their findings of physical abuse. Dem. sustained head injuries nearly identical to the injuries he had sustained in the first initial dependency that were also deemed to be abusive injury. Moreover, the social worker noted that the children had not sustained any further hematomas or broken bones while in foster care, which corroborated Dr. Grant's conclusion that Dem. did not have a contributing genetic condition and that the injuries were sustained while in the parents' care.

Although the parents had presented expert testimony from Dr. Scheller that the injuries may have been incurred by a different source, as previously explained, issues of fact and credibility are the province of the lower court, and we do not reweigh the evidence but merely determine if there are sufficient facts to support the findings of the juvenile court. (*In re L.O.*, *supra*, 67 Cal.App.5th at p. 238.) The juvenile court found Dr. Scheller to be the least credible of all of the medical professionals who had testified at the jurisdiction/disposition hearing. The court's finding was not unreasonable, considering Dr. Scheller did not provide any medical literature in his report for the current case, admitted his opinion is contrary to the vast majority of the medical

20

community, admitted he has not held a doctor's license since 1991, and admitted did not personally examine any of the children.

Based on Dem.'s significant head injury, Dev.'s facial and leg injuries, Dem.'s and Dev.'s medical reports, Mother's explanations of the children's injuries which were refuted by the medical doctors who had examined them, Dr. Grant's testimony that Dev.'s classic metaphyseal lesion on his lower leg was sustained from child abuse, and the numerous doctors' conclusions that Dem.'s head injury was suspicious for inflicted trauma, it was reasonable for the court to find the section 300, subdivision (e) allegations true. "A finding may be supported by circumstantial evidence as it is here. Otherwise, a family could stonewall the Department and its social workers concerning the origin of a child's injuries and escape a jurisdictional finding under subdivision (e)." (*In re E.H.* (2003) 108 Cal.App.4th 659, 670.) Under these circumstances, and in light of the evidence presented by DPSS and the children's counsel, it was entirely reasonable for the court to conclude that Mother and/or Father physically abused the children and caused their injuries.

We briefly note Mother's claim relating to subdivision (a) of section 300. As to the allegation of physical abuse pursuant to section 300, subdivision (a), an allegation that a child has suffered serious physical harm inflicted non-accidentally by a parent or guardian is sufficient to establish jurisdiction under that section. "For purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of

21

injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm." (§ 300 subd. (a).) Further, "[p]roof that either parent, the guardian, or other person who has the care or custody of a minor who is the subject of a petition filed under [s]ection 300 has physically abused, neglected, or cruelly treated another minor shall be admissible in evidence." (§ 355.1, subd. (b).) Such proof is sufficient to establish jurisdiction under section 300, subdivision (a) as to other related and unrelated children in the home. (*In re Marquis H.* (2013) 212 Cal.App.4th 718, 725-726.) "This provision [of section 355.1] is consistent with the principle that a parent's past conduct may be probative of current conditions if there is reason to believe that the conduct will continue." (*In re Y.G.* (2009) 175 Cal.App.4th 109, 116.)

Substantial evidence supports the juvenile court's true findings under section 300, subdivision (a) as to Dem. and Dev. for the reasons noted above. The overwhelming medical evidence shows that Dem. and Dev. had suffered serious physical harm while in their parents' care and custody. A forensic medical examination of Dev. determined he had sustained facial bruising and fractured tibia that were suspicious for physical abuse. Dr. Grant testified that Dev. sustained a classic metaphyseal lesion on his lower leg, that is typically sustained from child abuse when an arm or leg is jerked suddenly. Dr. Grant noted that the injury was more than 14 days old, which would mean it was incurred before he was placed in foster care. As to Dem., the children's qualified medical experts all testified with a reasonable degree of certainty that Dem.'s injuries were a result of

22

abusive head trauma. The record does not indicate the parents provided any expert opinion that Dem.'s head injuries were in fact caused by a trauma other than abuse or that Dev.'s facial and leg injuries were caused in foster care. Mother's explanations of the children's injuries were inconsistent with medical findings. Moreover, her arguments relate to credibility findings to which this court cannot make. "We do not reweigh the evidence, nor do we consider matters of credibility." (*In re E.H.*, *supra*, 108 Cal.App.4th at p. 669.) Further, "'issues of fact and credibility are the province of the trial court.'" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) The parents failed to rebut the extensive expert evidence presented by DPSS and the children's counsel that was supported by the majority of the medical community.

B. *Bypass of Services*

Mother argues that bypassing reunification services was not in the children's best interests because visitation had been positive and the parents had a "track record of successful reunification." Father contends there was insufficient evidence to support a denial of reunification services under either section 361.5, subdivisions (b)(3), (5) or (6) and that the court showed bias by believing one expert testimony over another expert's testimony. We reject these contentions.

Where, as here, the juvenile court finds multiple statutory grounds for denying reunification services, we need only conclude substantial evidence supports one of them in order to affirm the juvenile court's denial of services order. (See *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875-876 [where one basis is supported by substantial evidence

23

the court does not need to consider the sufficiency of evidence to support other bases].)
We conclude substantial evidence supports a denial of services under section 361.5, subdivision (b)(5) and need not address the denial of services on the other statutory grounds.

As a general rule, when a child is removed from parental custody under the dependency laws, the juvenile court is required to provide reunification services to "the child and the child's mother and statutorily presumed father." (§ 361.5, subd. (a).) However, it is also the "intent of the Legislature, especially with regard to young children, . . . that the dependency process proceed with deliberate speed and without undue delay." (*Marlene M. v. Superior Court* (2000) 80 Cal.App.4th 1139, 1151.) Thus, the statutory scheme recognizes that there are cases in which the delay attributable to the provision of reunification services would be more detrimental to the minor than discounting the competing goal of family preservation. (*Ibid.*) Specifically, section 361.5, subdivision (b), exempts from reunification services "'those parents who are unlikely to benefit'" from such services or for whom reunification efforts are likely to be "'fruitless.'" (*In re Joshua M.* (1998) 66 Cal.App.4th 458, 470, 474.)

The statutory sections authorizing denial of reunification services are sometimes referred to as "bypass" provisions. (*Melissa R. v. Superior Court* (2012) 207 Cal.App.4th 816, 821.) If the juvenile court finds one of the bypass provisions applies, it is prohibited from ordering reunification services for the parent unless it finds by clear and convincing evidence that reunification is in the best interest of the child. (§ 361.5, subd. (c)(2).) The

24

parent bears the burden of proving that reunification would serve the child's best interest. (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227.)

We review an order bypassing reunification services under subdivision (b) of section 361.5 for substantial evidence, bearing in mind the juvenile court was required to apply the heightened clear and convincing evidence standard of proof. (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96; *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.) We ask "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable" that the facts at issue were true. (*Conservatorship of O.B.*, *supra*, at pp. 995-996.) We "view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at p. 996.)

In this case, the juvenile court denied the parents reunification services under section 361.5, subdivisions (b)(3), (5), (6), and (7). Subdivision (b)(3) of section 361.5 allows the juvenile court to bypass reunification services to a parent where the court finds by clear and convincing that "the child or a sibling of the child has been previously adjudicated a dependent pursuant to any subdivision of [s]ection 300 as a result of physical or sexual abuse, that following that adjudication the child had been removed from the custody of the child's parent or guardian pursuant to [s]ection 361, that the child has been returned to the custody of the parent or guardian from whom the child had been

25

taken originally, and that the child is being removed pursuant to [s]ection 361, due to additional physical or sexual abuse." (§ 361.5, subd. (b)(3).)

Subdivision (b)(5) of section 361.5 allows for the denial of reunification services when the court finds, by clear and convincing evidence, that the child was brought within the jurisdiction of the court under section 300, subdivision (e). Subdivision (e) of section 300 describes a child who was under five years of age and suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child.

Subdivision (b)(6) of section 361.5 allows the denial of reunification services where the juvenile court finds by clear and convincing evidence that the child was adjudicated a dependent pursuant to any subdivision of section 300 as a result of severe physical harm to the child caused by a parent and the court makes a factual finding that it would not benefit the child to pursue reunification services with the parent. "Severe physical harm" under the statute, as relevant here, may be based on, but is not limited to, deliberate and serious injury inflicted to or on a child's body by an act or omission of the parent. (§ 361.5, subd. (b)(6)(C).)

In light of our conclusion *ante*, Father's claim that there was insufficient evidence to support a denial of reunification services under section 361.5, subdivisions (b)(3), (b)(5) and (b)(6) has no merit. (See § III.A., *ante*.) We further note that the court also denied the parents reunification services under section 361.5, subdivision (b)(7), finding "[t]hat the parent is not receiving reunification services for a sibling or a half sibling of

26

the child pursuant to paragraph (3), (5), or (6)." Father does not dispute the denial of services under section 361.5, subdivision (b)(7). We also reject Father's argument relating to the credibility findings made by the juvenile court, and remind Father we do not reweigh credibility issues. We further reject Father's unsupported attempt to apply global racial issues without factual support showing relevance to this case.

Mother argues that even if sufficient evidence supports application of the bypass provisions, the juvenile court erred by denying them reunification services, because reunification served the children's best interests. The argument lacks merit.

Subdivision (c)(2) of section 361.5 states that if the bypass provision (§ 361.5, subd. (b)(6)) applies, then the court "shall not order" reunification services "unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." In other words, once the court finds that the bypass provision applies, denial of reunification services is mandatory unless the court makes the countervailing factual finding. (*In re A.E.* (2019) 38 Cal.App.5th 1124, 1141.)

In determining whether reunification is in a child's best interest, the court may consider the "parent's current efforts and fitness as well as the parent's history." (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 66.) "The gravity of the problem that led to the dependency also is relevant to the question of best interest." (*Ibid.*)

The parent bears the burden of showing that reunification is in the child's best interest. (*In re Raul V.* (2022) 82 Cal.App.5th 290, 300; *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.) When the juvenile court determines that the parent failed to carry

their burden of proof, we ask "'whether the evidence compels a finding in favor of the appellant as a matter of law,' that is, whether the evidence supporting [the parent's] position 'was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*In re Raul V.*, *supra*, at p. 301.)

The parents in this case do not argue that the evidence compels a finding in their favor as a matter of law. Nor could they make that showing on this record. Mother relies on her past cooperation and performance when provided with services, noting she had successfully reunified with the children, as well as her positive visits with the children. But she does not address the significant contrary evidence showing her lack of benefit from services previously provided and the fact the current dependency was initiated a day after the initial dependency was terminated.

Dev. was initially detained in June 2019, when he was 14 months old and Dem. was detained when he was only six weeks old. At six weeks of age, Dem. had sustained serious cerebral bleeding while in the care and custody of the parents. The children were returned to their parents in May 2020 and the dependency was terminated in December 2020. However, Dev. and Dem. were immediately re-detained on December 10, 2020, when they were 31 months and 19 months old respectively after a CT scan showed Dem. had a new acute subdural hemorrhage. Dev. also had a healing tibia fracture consistent with abusive injury and their sister L.L. had insufficient nutrition and growth. The children have spent most of their young lives in foster care, and not in the care of the

parents. The new and current brain bleed sustained by Dem. and Dev.'s tibia fracture and facial injuries shows the parents failed to benefit from services in the first case, and therefore it was not in the children's best interests to pursue reunification yet again and potentially expose these young children to further physical abuse. In light of all that evidence, we cannot say that the evidence in favor of Mother's position was uncontradicted, unimpeached, and so weighty as to compel a finding that reunification served the children's best interests.

Based on the foregoing reasons, the parents have not shown that the juvenile court erred by failing to find reunification services were in the children's best interests.

IV.

DISPOSITION

The petitions for an extraordinary writ and request for a stay are denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
Acting P. J.

We concur:

FIELDS
J.

RAPHAEL
J.

29